No. 93-513

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

STATE OF MONTANA,

    Plaintiff and Respondent,

    v.

NIKOS PASTOS,

    Defendant and Appellant.

APPEAL FROM:   District Court of the Fourth Judicial District,
               In and for the County of Missoula,
               The Honorable Douglas G. Harkin, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

            Diana  P.  Leibinger,  Public  Defender  Office,
            Missoula, Montana (argued)

        For Respondent:

            Hon. Joseph P. Mazurek, Attorney General, Micheal S.
            Wellenstein, Assistant Attorney General, Helena,
            Montana,  (aruged);  Robert  L.  Deschamps,  III,
            Missoula County Attorney, Karen S. Townsend, Deputy
            Missoula County Attorney, Missoula, Montana

**FILED**

DEC 20 1994

Filed;

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Argued: September 15, 1994

Submitted: September 15, 1994

Decided: December 20, 1994

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

This is an appeal from a Fourth Judicial District Court, Missoula County, memorandum and order, denying defendant Nikos Pastos' (Pastos) motion to suppress evidence and from the judgment dated August 30, 1993, adjudging him guilty of the offense charged. We affirm.

The sole issue on appeal is whether the District Court erred in denying Pastos' motion to suppress evidence discovered during an inventory search of his rucksack at the jail following his arrest.

### FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from the State's motion and affidavit for leave to file the information and from the record on appeal.

On February 17, 1992, Missoula City Police Officer Ed Gydas was on routine patrol when he observed Pastos, whom he knew from previous contacts, walking down South 5th East in Missoula. Gydas requested a warrants check and learned that there were active city warrants out for Pastos' arrest. Gydas stopped Pastos, who was carrying a blue rucksack; after asking him for identification and checking his birthday, Gydas confirmed that Pastos was the person wanted on the city warrants. Pastos was arrested and was transported to the Missoula County Jail for booking. Pastos' coat, a black bag and the blue rucksack were transported to the jail with him.

At the jail, a routine booking inventory was conducted with respect to each of the items of Pastos' property. A green army

2

style pouch in the blue rucksack was found to contain four baggies of mushrooms. Police Detective Marty Ludeman transported the bags of mushrooms seized from Pastos' rucksack to the Montana State Crime Lab. The mushrooms tested positively for hallucinogenic psilocybin, a controlled substance.

Pastos was charged with criminal possession of dangerous drugs in violation of § 45-9-102, MCA. He entered a plea of not guilty and, subsequently, moved to suppress the evidence obtained during the inventory search of his rucksack at the jail. The District Court denied the motion.

Pursuant to a plea bargain agreement, Pastos withdrew his not guilty plea and entered an Alford guilty plea, reserving his right to appeal the denial of his motion to suppress. The District Court accepted Pastos' plea, adjudged him guilty of the charged offense, and deferred imposition of sentence for three years. Pastos appeals.

## STANDARD OF REVIEW

We review the District Court's conclusions of law in ruling on a motion to suppress evidence to determine whether the trial court's interpretation and application of the law is correct. State v. McCarthy (1993), 258 Mont. 51, 55, 852 P.2d 111, 113; Steer Inc. v. Department of Revenue (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603.

## DISCUSSION

In this case we are called upon to determine whether a routine inventory search of an arrestee's possessions conducted at the

3

station house in conjunction with the booking process and in accordance with the law enforcement authority's standard administrative policy or procedure, passes muster under the Montana Constitution.

In contending that such searches are unlawful, Pastos argues that Sections 10 and 11 of Article II of the Montana Constitution provide Montana citizens with a more expansive right of privacy than that afforded by the Fourth Amendment of the federal constitution or the penumbrae of the various amendments to the federal constitution. According to Pastos this broader right of privacy was violated by the search of his rucksack after he was placed in jail. Pastos contends that his right to privacy outweighs any governmental interest in the search of his rucksack, and that, therefore, this Court should order the trial court to suppress the evidence obtained by the police during the search. Pastos argues that our decision in State v. Sierra (1985), 214 Mont. 472, 692 P.2d 1273, is dispositive of the legal question presented.

The State counters that the District Court did not err in denying Pastos' motion to suppress the evidence discovered during the inventory search because there is a compelling state interest in conducting such searches which outweighs Pastos' privacy interest. Moreover, the State asserts that State v. LaMere (1987), 226 Mont. 323, 735 P.2d 511, a more recent case, and the case relied upon by the District Court in making its decision, overruled Sierra by implication and that under the principles

4

enunciated in LaMere, the search was proper.

In discussing the question on appeal, we note, at the outset, that no evidence was presented to the District Court that the search of Pastos' possessions was initiated for the purpose of discovering the fruits of other crimes or to gather evidence of the offense for which he was arrested. In fact, Pastos admitted during oral argument that his was a routine inventory search conducted at the station house pursuant to the law enforcement authority's standardized police administrative procedure applicable to all persons arrested. We underscore that fact and emphasize that our opinion here is limited to those type of searches only.

We begin our analysis by setting forth the two sections of Article II of the Montana Constitution which are implicated here. Section 10 provides:

> The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.

Section 11 provides:

> The people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures. No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing.

Since a search and seizure was involved in this case, Section 11, is, obviously, pertinent. Notwithstanding, on appeal, Pastos argues that the search and seizure conducted here was unlawful in that his right of privacy under Section 10 was violated. In support of that argument he relies on our prior cases that have,

5

for the most part, dealt with inventory searches in the context of Section 10. Accordingly, in view of the posture in which the question of law to be decided is presented to us, we will, likewise, focus our analysis in this opinion on Article II, Section 10.

In discussing Montana's constitutional right of privacy, we have heretofore recognized at one and the same time the fundamental nature of that right, and that the right is not absolute under all circumstances. "The right of individual privacy is a fundamental constitutional right expressly recognized as essential to the well-being of our society. The constitutional guarantee of individual privacy is not absolute." State, Etc. v. District Court, Etc. (1979), 180 Mont. 548, 555-56, 591 P.2d 656, 660. By its terms, Section 10 provides that the right of individual privacy shall not be infringed without a showing of a compelling state interest. Art. II, Sec. 10, Mont.Const.

We also recognize that when the government intrudes upon a fundamental right, any compelling state interest for doing so must be closely tailored to effectuate only that compelling interest. Zablocki v. Redhail (1978), 434 U.S. 374, 388, 98 S.Ct. 673, 54 L.Ed.2d 618.

Under such analysis, the legal question at issue then becomes: "Is there a compelling state interest which justifies a routine, administrative inventory search of the personal property on, or in the possession of the arrestee at the station house following a lawful arrest?" We answer this question in the affirmative, and

6

conclude that, with regard to such searches, the compelling state interest is the protection of the arrestee, the police, other inmates, and persons and property in and about the station house from the harm and potential for harm posed by weapons, dangerous instrumentalities and hazardous substances that might be concealed on or in the possessions of the arrestee. There are also other subordinate interests which support, but which do not, in and of themselves, justify an inventory search of personal property found on or in the possession of a lawfully arrested person.

In discussing the compelling state interest which we conclude justifies the search at issue here, we first must, necessarily, acknowledge the reality of the times in which we live. There is little doubt that we live in a violent society. Hardly a week goes by without news reports of workers, public officials, employees and other innocent citizens being injured or killed in indiscriminate assaults in offices, work places, schools, restaurants, courtrooms, police stations and other private or public institutions. Whether it be the White House or the doctor's office, sadly, no citizen or property is, today, immune from attack by the deranged, the disaffected, the misguided, the terrorist or the zealot.

The reality of violence and the potential for violence in our society dictates that it is a proper and legitimate concern of law enforcement officers that an arrestee may have concealed on his or her person or in his or her possession weapons, dangerous instrumentalities such as explosives or incendiary devices or hazardous substances, which could be used to injure the police,

7

fellow inmates, employees and members of the public in and about the station house.

That fact was recognized by the U.S. Supreme Court in Illinois v. Lafayette (1983), 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65, wherein the court observed:

> Arrested persons have also been known to injure themselves--or others--with belts, knives, drugs, or other items on their person while being detained. Dangerous instrumentalities--such as razor blades, bombs, or weapons--can be concealed in innocent-looking articles taken from the arrestee's possession.

Lafayette, 462 U.S. at 646. This Court has acknowledged those same concerns. See, City of Helena v. Lamping (1986), 221 Mont. 370, 373, 719 P.2d 1245; LaMere, 735 P.2d at 512.

We agree with the court in Lafayette, that

> [t]he bare recital of these mundane realities justifies reasonable measures by police to limit these risks--either while the items are in police possession or at the time they are returned to the arrestee upon his release. Examining all the items removed from the arrestee's person or possession and listing or inventorying them is an entirely reasonable administrative procedure. It is immaterial whether the police actually fear any particular package or container; the need to protect against such risks arises independently of a particular officer's subjective concerns. Citing United States v. Robinson (1973) 414 U.S. 218.

Lafayette, 462 U.S. at 646.

Notwithstanding, Pastos argues that:

> [p]olice do not need to guard against danger from closed packages with a complete inventory search, either. To determine what kind of search police should conduct, we must first determine what danger could possibly lurk inside an arrestee's backpack, luggage, or other closed container...We must remember we are talking about danger from items carried in separate packages by ordinary citizens."

8

We disagree. It is both impractical and unreasonable to expect law enforcement officers to be responsible for, among the myriad of tasks to be completed during post-arrest, assessing whether an arrestee is an "ordinary citizen" or one who is capable of or likely to be in possession of weapons, dangerous instrumentalities or hazardous substances which may harm him or herself or others. The simple fact is the police deal with a wide variety of people, many of whom are very dangerous and who, as a matter of course or for some purpose related to a particular criminal endeavor, conceal weapons, dangerous instrumentalities or hazardous substances in innocent looking containers such as, for example, suitcases, rucksacks, purses and wallets. It is both unrealistic and unsafe for the police to fail to take routine, administrative steps to protect themselves, the arrestee and others in the station house from the actual or potential danger such persons pose.

Pastos, however, argues, "[i]f an arrestee does carry a weapon in a separate closed container, that weapon does not pose a threat to authorities once the item is separated from the suspect." Again, we disagree. While the weapon may not pose a threat while the arrestee is incarcerated, it cannot be disputed that it only takes seconds for an arrestee, on his or her release, to open a closed container, retrieve the weapon and use it against a police officer or another person in the station house. Moreover, an explosive, incendiary device or hazardous substance concealed in the arrestee's possessions poses a continuous threat to the safety

of persons and property while stored on the station house premises. As stated by Justice Marshall in his concurrence in Lafayette, joined by Justice Brennan, "[t]he practical necessities of securing persons and property in a jailhouse setting justify an inventory search as part of the standard procedure incident to incarceration." Lafayette, 462 U.S. at 649.

Pastos also asserts that the "less intrusive means rule," discussed in State v. Sawyer (1977), 174 Mont. 512, 571 P.2d 1131, and in Sierra, should be applied to the inventory of an arrestee's possessions upon his or her incarceration in jail. Pastos contends that, as a less intrusive means of dealing with the sorts of potential problems referred to above, the police could have secured his rucksack for safekeeping, could have inventoried valuable items found in plain view, could have marked the rucksack in a manner from which one could determine whether there had been tampering and then could have placed the rucksack in an appropriate area for safekeeping during the arrestee's detention.

Keeping in mind that the protection of the arrestee, the police and other persons in and about the station house from the potential harm posed by weapons, dangerous instrumentalities and hazardous substances concealed on or in the arrestee's possessions is the primary justification for administrative inventory searches, as a practical matter, there are several problems inherent in the "less intrusive means" approach.

First, if, as pointed out above, the closed container contains a weapon, it can take but a matter of seconds for the arrestee to

10

retrieve the weapon and use it against an unsuspecting person. This concern alone vitiates Pastos' argument that a less intrusive means of conducting an inventory search will accomplish the State's goal of safeguarding persons and property in the station house. A search of a closed container found on or in the possession of the arrestee is the least intrusive method of alleviating any risk from weapons and dangerous instrumentalities that may be used by an arrestee upon his or her release from the jail.

Second, if an arrestee is carrying a concealed bomb, explosive or incendiary device, there is little, short of a physical search of the arrestee's possessions, that the police can do to protect against the potential harm inherent in such a situation. While Pastos suggested at oral argument that the police could store prisoners' personal possessions in a bomb-proof room, it is not likely that Montana police stations and sheriff's offices would have access to such a room and even less likely that city councils, county commissioners and taxpayers would be willing to finance the cost to construct that type of facility. Again, a physical inventory search is the most practical and least intrusive method of dealing with the problem.

Third, it is impractical and unreasonable to expect the police to make decisions on a daily basis about which containers to search and what, if any, is the least intrusive means available to inventory an arrestee's personal property on or in his or her possession. Lafayette, 462 U.S. at 648. "[I]t would be unreasonable to expect police officers in the everyday course of

11

business to make fine and subtle distinctions in deciding which containers or items may be searched and which must be sealed as a unit." Lafayette, 462 U.S. at 648. The potential for danger alone justifies the inventory of items found on or in the possession of a lawfully arrested person at the station house. "[A] single familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront." Lafayette, 462 U.S. at 648, citing New York v. Belton (1981), 453 U.S. 454. To a certain extent, we must defer to police departments in their development of standardized administrative procedures which will best serve to protect the interests of the arrestee, the police, others incarcerated in jail, and society at large. Lafayette, 462 U.S. at 648.

While Pastos argues, correctly, that the right of privacy can only be infringed by a compelling state interest closely tailored to effectuate that interest, it does not follow that the less intrusive means rule mandates that the police use some method short of physically searching the arrestee's possessions. The routine, administrative inventory search of the personal property on or in the possessions of the arrestee at the police station following arrest is closely tailored to effectuate the compelling interest of safeguarding persons and property in the station house from weapons, dangerous instrumentalities and hazardous substances which might be concealed in the arrestee's possessions.

12

Under Article II, Section 10, an arrestee has an expectation of and constitutional right of privacy in the personal property on his or her person or in his or her possessions while at the police station. However, that privacy interest is not absolute. We conclude that the State has a legitimate and compelling interest in protecting, to the extent possible, the safety of the arrestee and other persons in and about the station house from weapons, dangerous instrumentalities, and hazardous substances which might be concealed on or in the personal property and possessions of the arrestee. We hold that this compelling interest justifies the routine, administrative inventory search of the personal property on or in the possession of the arrestee at the police station following a lawful arrest.

While the State's interest in protecting the arrestee, the police and other persons in and about the station house from harm is, alone, sufficient to justify the sort of routine, administrative inventory search at issue here, the cases also discuss other purposes which serve to justify--though, we conclude, to a subordinate extent--such searches. We reiterate those briefly in the interest of fully discussing this issue.

Courts generally recognize that a state also has an interest in protecting an arrestee's property by accounting for any money, articles or items he or she may have in his or her possession at the time he or she is placed in jail. LaMere, 735 P.2d at 513; Lamping, 719 P.2d at 1247; Lafayette, 462 U.S. at 646. As stated in Lafayette, "[i]t is not unheard of for persons employed in

13

police activities to steal property taken from arrested persons. . . ." Lafayette, 462 U.S. at 646. The inventory search is a reasonable way to ensure the protection of an arrestee's property during his or her detention. Colorado v. Bertine (1987), 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739. "Knowledge of the precise nature of the property help[s] guard against claims of theft, vandalism, or negligence." LaMere, 735 P.2d at 513, citing Bertine, 479 U.S. at 372-73. See also State v. Swanson (1986), 222 Mont. 357, 362, 722 P.2d 1155, 1158, (one of the purposes of inventory searches is the safekeeping of prisoners' property, citing Lafayette.)

Courts also acknowledge that a former arrestee may bring false claims for items taken while in the custody of the police. "A standardized procedure for making a list or inventory as soon as reasonable after reaching the station house not only deters false claims but also inhibits theft or careless handling of articles taken from the arrested person." Lafayette, 462 U.S. at 646. The police cannot protect themselves against false claims if they do not know the extent of the arrestee's possessions they have in safekeeping. See also, Swanson, 722 P.2d at 1158.

In support of his position, Pastos argues throughout his brief that Sierra is on all fours with and should control this Court's disposition of the instant case. He also argues that LaMere, which is in conflict with the principles enunciated in Sierra, should be overruled. As pointed out above, the State maintains that LaMere implicitly overruled Sierra and controls the disposition of the

14

instant case. In view of the apparent conflict in our cases dealing with the subject of inventory searches, we discuss them with a view to clarifying our case law on this subject.

We first analyzed a search and seizure issue in light of the Montana right of privacy, Article II, Section 10, in Sawyer. That case, unlike the present, involved a routine inventory search of the defendant's automobile following his arrest and detention on reckless driving charges. The search uncovered amphetamines under the driver's seat of the car. Sawyer, 571 P.2d at 1132. Rejecting a Fourth Amendment analysis under South Dakota v. Opperman (1976) 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000, we, instead, concluded that the inventory search conducted by the police significantly infringed the defendant's right of privacy under the Montana Constitution. Sawyer, 571 P.2d at 1134. We held that neither protecting the contents of the vehicle for the benefit of the owner, (where he had the ability to, but had not consented to the search,) nor protecting the police from claims for lost property, (where as "gratuitous" bailees, the police owed the defendant only a duty of "slight care" in protecting his property,) justified the warrantless search. Sawyer, 571 P.2d at 1134.

Since Sawyer involved the inventory search of an automobile, we necessarily did not discuss or address the different and more serious concerns which justify the routine booking search at issue in the instant case. Instead, our focus in Sawyer was on protecting the defendant's greater constitutional right of privacy in the face of a less compelling need to protect his property in

15

the hands of the police.

In <u>Sierra</u>, the defendant and a friend were arrested by the Livingston police and were taken to the station house to be detained until it could be determined whether they were legally in the United States. During the booking procedure defendant was ordered to empty his pockets. In doing so he removed a small quantity of a substance that turned out to be marijuana. Immediately afterwards, his suitcase, which he carried at the time of his arrest, was opened to reveal a substantial quantity of marijuana. <u>Sierra</u>, 692 P.2d at 1275. The trial court ruled that the marijuana removed from the defendant's pocket was admissible, while that discovered in his suitcase was not. <u>Sierra</u>, 692 P.2d at 1275.

On appeal, we concluded that a means "less intrusive" than opening the defendant's suitcase was required under the circumstances; that the police should not have opened the closed suitcase; and that the search of the suitcase violated the defendant's privacy interests under Article II, Section 10, of the Montana Constitution. <u>Sierra</u>, 692 P.2d at 1275. Citing our decision in <u>Sawyer</u> and to our application of Article II, Section 10 in that case, we, again, required that the police use the less intrusive means of separating the defendant from his possessions and cataloging, rather than searching, the arrestee's personal property. <u>Sierra</u>, 692 P.2d at 1276.

Significantly, however, aside from a passing reference to the "danger from contents of uninventoried packages" in our rejection

16

of the Fourth Amendment approach of Lafayette, we did not discuss or analyze whether the State might, under Article II, Section 10, of the Montana Constitution, demonstrate a compelling interest in protecting the police, the arrestee and other persons in and about the station house from weapons, dangerous instrumentalities and hazardous substances concealed in the arrestee's personal possessions, which would, in turn, justify a routine booking search.

Following Sierra, we decided Lamping. In that case, the defendant, under arrest at the county jail, was subjected to a routine booking search of his personal property. While searching Lamping's person, the jailer pulled out of Lamping's shirt pocket what appeared to be a crumpled, open cigarette pack. On inspecting the pack, the jailer recovered a marijuana cigarette, which the defendant subsequently moved to suppress. Lamping, 719 P.2d at 1246-47. We distinguished Sierra on its facts noting a difference "between searches of the person [Lamping] and searches of possessions within an arrestee's immediate control [Sierra]." Lamping, 719 P.2d at 1247.

While Lamping involved the search of an article of personal property that the defendant would have been allowed to keep on his person in his jail cell, rather than an article which the police would have retained until his release from custody, we, nevertheless, for the first time acknowledged that "[d]angerous instrumentalities can be concealed in innocent looking articles taken from an arrestee's possession, [and that] [t]he state has a

17

compelling interest in protecting prisoners from potential danger."
_Lamping_, 719 P.2d at 1247. While we did not otherwise discuss or analyze whether, under Article II, Section 10, that same compelling interest might also extend to the protection of the police and other persons in and about the station house and cover weapons, dangerous instrumentalities and hazardous substances concealed in possessions of the arrestee which were to be stored at the station house until his release, it was unnecessary that we do so under the facts of that case.

In _LaMere_, we reversed the trial court's granting of the defendant's motion to suppress evidence seized during a routine inventory search of his person prior to his incarceration at the county jail. At the station house, following LaMere's arrest, two items of personal property were taken from him, were opened, were searched and evidence seized therefrom. One item was a leather pouch located in the inside pocket of defendant's jacket; the other was a bank money bag removed from under the defendant's pants leg. Both items were found to contain controlled substances. _LaMere_, 735 P.2d at 511.

In granting the defendant's motion to suppress, the trial court relied on _Sierra_. On appeal, we were asked to reconsider our decision in that case in light of _Lafayette_; and, sua sponte, we also raised a then recent case not argued by the parties, _Bertine_, an automobile inventory search case. _LaMere_, 735 P.2d at 512. In reversing the district court, we held that _Lamping_ controlled, again pointing out that "dangerous instrumentalities can be

18

concealed in innocent looking articles taken from an arrestee's possession and [that] the State has a compelling interest in protecting prisoners from potential dangers and [in protecting] the defendant and the officer by accounting for any money the person has." LaMere, 735 P.2d at 512. We also specifically adopted the Bertine rationale, that knowledge of the precise nature of (and securing) the arrestee's property protected against unauthorized interference and claims of theft, vandalism or negligence. Moreover, we observed that "[s]uch knowledge also helped to avert any danger to police or others that may have been posed by the property." LaMere, 735 P.2d at 513.

While, as regards the instant case, the State argues that LaMere is dispositive, we conclude that is not necessarily clear. If we assume that the two containers taken from LaMere were not going to be returned to him but were going to be stored until his release, LaMere is factually more akin to Sierra. If, on the other hand, the two items were going to be returned to LaMere, then his case is factually closer to Lamping. Our decision does not indicate the intended disposition of the two articles of personal property although we concluded that Lamping controlled. LaMere, 735 P.2d at 512.

Moreover, we reached our decision in LaMere without any reference to or analysis of the defendant's right of privacy under Article II, Section 10. We simply adopted the rationale of Bertine, an automobile inventory search case as the justification for the inventory search of defendant's person and possessions.

19

Bertine, of course, runs directly counter to our decision in Sawyer, which was an automobile search case and in which we held that the defendant's Article II, Section 10, right to privacy, had been violated by the warrantless inventory search. We did not overrule Sawyer notwithstanding our adoption of the Bertine rationale. Furthermore, although the State, here concludes (as did Justice Hunt in his LaMere dissent) that we overruled Sierra in LaMere, our opinion does not reflect that, if that was our intention at the time.

Finally, since we did not refer to Article II, Section 10, in LaMere, we had no occasion to focus on whether there was any compelling state interest that justified the inventory search of the defendant's person and possessions. We simply referenced the passages from Lamping and Bertine mentioned above.

Our decision in State v. Holzapfel (1988), 230 Mont. 105, 748 P.2d 953, followed LaMere. In that case, following Holzapfel's arrest on an outstanding warrant for drug charges, he was transported to the county jail and was booked. Without obtaining a search warrant, a law enforcement officer took the defendant's wallet from the jailer and examined it under ultraviolet light, finding traces of detection powder. The defendant's hands were thereafter likewise examined and traces of detection powder were found. Holzapfel moved to suppress the results of the post-arrest, nonconsensual warrantless search of his wallet. Holzapfel, 748 P.2d at 109.

In affirming the trial court's denial of the motion to

20

suppress, we determined that the search was justified as incident to the defendant's arrest, citing various Ninth Circuit cases, and that the defendant's constitutional privacy guarantees were satisfied on the basis of Lamping's distinction between searches of the person and objects immediately associated with the person and searches of possessions within the arrestee's immediate control.

A close reading of Holzapfel, however, leads to the conclusion that the search at issue in that case was not conducted as a routine, inventory booking search, but, rather, as a search for specific evidence of the offense with which the defendant was charged. Accordingly, and without commenting on the rationale of Holzapfel as applied to its facts, we conclude that case has no application here.

In view of the above discussion of our prior decisions and in view of our holding in the instant case, we take this opportunity to clarify our prior case law on the subject of routine inventory searches. First, as pointed out initially, our decision here is not applicable to routine inventory searches of vehicles. Because of the defendant's greater State constitutional right of privacy, our decision in Sawyer continues to be the law in this State as regards routine automobile inventory searches where the defendant has been arrested and his or her vehicle impounded and where there are no exigent circumstances or other recognized exceptions from the warrant requirement which justify a warrantless search.

Second, the police may conduct a routine, administrative inventory search at the station house of the arrestee and of closed

21

containers on his or her person or in his or her immediate possession at the time of his arrest. Such a search is authorized if conducted pursuant to a standardized policy or procedure adopted by the police and routinely utilized in the booking process. In Montana, such a search is in derogation of the arrestee's constitutional right to privacy under Article II, Section 10, but is, nevertheless, justified on the basis of the compelling state interest in protecting the arrestee, the police, other inmates and persons and property in and about the station house from the harm and potential for harm posed by weapons, dangerous instrumentalities and hazardous substances which might be concealed on the person of the arrestee or in closed containers on his or her person or in his or her possessions.

Third, to the extent that our decision in Sierra is inconsistent with our opinion here, that case is expressly overruled to the extent of such inconsistencies. Moreover, while Lamping and LaMere are consistent as to result with our decision here, henceforth, the legal principles set forth in this opinion shall govern cases involving routine station house booking searches.

In conclusion and based on our discussion above, we hold that the District Court's denial of Pastos' motion to suppress should be and is, hereby, AFFIRMED.

_____
Justice

We Concur:

_____
Chief Justice

22

_____
Jethro Conway Burrison

_____


_____
Justices

Justice Terry N. Trieweiler dissenting.

It's gotten so that between tennis shoes (*see State v. Mummey* (1994), 264 Mont. 272, 871 P.2d 868) and backpacks, it's just not safe to leave your house anymore.

Nevertheless, Article II, Section 10, of the Montana Constitution, provides as follows:

> **Right of privacy.** The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.

Article II, Section 11, of the Montana Constitution provides:

> **Searches and seizures.** The people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures. No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing.

These provisions are set forth in this dissent in their entirety because their clarity of purpose is otherwise lost in the maze of governmental and judicial rationalizations for their erosion and eventual elimination. The majority opinion is simply the most recent example of those ill-founded rationalizations.

It should not be necessary to cite over ten other decisions to apply these clear provisions to the facts in this case.

I would conclude that there was no compelling state interest for invading the privacy of the defendant after he had been arrested and was no longer in control of his property. I also conclude that there was no probable cause for searching the defendant's property and that the facts in this case did not

24

present any legitimate exception to the requirement that before his effects are searched by governmental officials, probable cause be shown and a search warrant obtained.

Before further discussion, it is necessary to clarify what this case is not about. Without foundation, authority, or reference to anything other than the sensationalized news coverage provided by the commercial media, the majority opinion takes judicial notice that:

> There is little doubt that we live in a violent society. Hardly a week goes by without news reports of workers, public officials, employees and other innocent citizens being injured or killed in indiscriminate assaults in offices, work places, schools, restaurants, courtrooms, police stations and other private or public institutions. Whether it be the White House or the doctor's office, sadly, no citizen or property is, today, immune from attack by the deranged, the disaffected, the misguided, the terrorist or the zealot.

The majority opinion stands for a new principle of constitutional law which is that a compelling state interest can be established based on the majority's interpretation of what they see on the evening news.

Presumably, based on these generalized concerns, a rationalization could be set forth for the suspension of all constitutional rights. Certainly, if a backpack brought into a police station is potentially dangerous, it would be equally dangerous if brought into a school yard, basketball game, doctor's office, or any other government building. Based on the majority's alarm at the general state of affairs in this Country (at least as reported on CNN), everyone, everywhere should be searched. There

25

is no way to distinguish the defendant in this case from any other citizen.

This case is not about someone who came to the police station making threats. It is not even about someone who expected to come to the police station.

This case is not about someone arrested for a violent act. It is not even about someone arrested in the act.

This case is not about someone with a violent history, nor any history of using weapons. Nor is it about what other members of the court may have seen on the evening news involving some other person under other circumstances.

This case is not about anyone who the police had any reason to suspect might have a bomb, a gun, a knife, or any other weapon in his backpack.

This case is about someone who was unexpectedly arrested for failure to pay a city court fine, and who, at the time of his arrest, was walking down a public street, minding his own business, but who, unfortunately, did not have enough money to post a minor bond after his arrest.

This case is about a police station pretext for invading the defendant's privacy by going on a fishing expedition and digging through his personal effects without any reason to suspect that the police needed to do so.

There was no more reason to suspect that the defendant had concealed weapons, dangerous instrumentalities, explosives or incendiary or hazardous substances in his backpack than there was

26

to suspect any other person walking down the street wearing a backpack. The danger of some unexpected incendiary or explosive device detonating in a police station was no greater than the danger of a similar device detonating at any other location where people carry backpacks.

The majority's rationale for searching the defendant's backpack applies to every backpack worn by every person at every location in the country.

The majority reasons that if a backpack contains a weapon, the arrestee could recover the weapon after his release and use it against police officers. However, if the arrestee is lawfully in possession of a weapon, the police have to give it back to him when he is released anyway. Furthermore, the police have a right to retain all of defendant's possessions while he is in custody. They do not need to search the backpack in order to recover weapons that are inside. Once the backpack was taken from defendant's possession, the State's interest in regulating the jail environment was protected, and no further intrusion was necessary.

The majority also discussed the State's interest in protecting an arrestee's property by accounting for his possessions at the time he was placed in jail. However, if it is the arrestee's interest that the State is concerned with, then the arrestee should have the option of either waiving his right to privacy or assuming the risk that some of his possessions might be gone when he is released. The assumption that the State has a greater interest in protecting the defendant's property than he has himself, impresses

27

me as a classic example of a pretext for invading someone's privacy. This transparent justification was best disposed of in *State v. Sawyer* (1977), 174 Mont. 512, 571 P.2d 1131, *overruled on other grounds by State v. Long* (1985), 216 Mont. 65, 69, 700 P.2d 153, 156, where we stated:

> It would be anomalous to justify a search of an automobile to be for the owner's benefit, when the owner is available but does not consent to the search. Surely the property owner is an adequate judge of the treatment of the property that would most benefit him.

*Sawyer*, 571 P.2d at 1134.

The majority's concerns about jailhouse safety and the well-being of the arrestee were appropriately analyzed by the Supreme Court of Alaska in *Reeves v. State* (Alaska 1979), 599 P.2d 727. That case presented facts nearly identical to those in this case. The defendant in *Reeves* was arrested for driving under the influence of alcohol. However, after his arrest, the arresting officer learned of an outstanding bench warrant because of Reeves' failure to appear in connection with a traffic violation. He was transferred to the police station for sobriety testing where he was searched prior to incarceration. As a result of the search, an opaque balloon which contained a brownish colored powdery substance was removed from his pocket. The contents were examined, and the police ultimately learned that it was an illegal drug. The issue decided by the Alaska Supreme Court was whether pre-incarceration inventory searches, like the one conducted in this case, violated Article I, Section 14, of the Alaska Constitution, which is similar

28

to the first sentence in Article II, Section 11, of the Montana Constitution.

First, addressing the majority's apparent conclusion that invasions of privacy are somehow preferable if they are routine, rather than with a specific intent to discover evidence, the Alaska Supreme Court stated that:

> [T]here can be no doubt that a pre-incarceration inventory procedure such as that followed in this case is a "search" in the sense that the term is employed in article I, section 14 of the Alaska Constitution. The governmental intrusion inherent in a pre-incarceration inventory search of an arrestee's person is no less an intrusion because it is routine in nature. Nor does the fact that such an inventory is conducted at least in part for the purpose of securing and protecting the arrestee's property alter the fact of intrusion.

*Reeves*, 599 P.2d at 733 (emphasis added) (footnote omitted).

The Alaska Supreme Court noted that based on interpretations by the United States Supreme Court, the Fourth Amendment to the United States Constitution does not prohibit inventory searches, but in a responsible approach to interpreting and preserving its own constitutional protections, stated that:

> As we have frequently noted, the Alaska constitutional guarantee against unreasonable searches and seizures is broader in scope than fourth amendment guarantees under the United States Constitution, at least in part because of the more extensive right of privacy guaranteed Alaskan citizens by article I, section 22 of our state constitution.

*Reeves*, 599 P.2d at 734 (footnote omitted).

We, likewise, have an extensive right of privacy guaranteed by the Montana Constitution at Article II, Section 10.

29

The Alaska Supreme Court, appropriately began its discussion by reiterating the fundamental principle of privacy law that "'a search without a warrant is per se unreasonable unless it clearly falls within one of the narrowly defined exceptions to the warrant requirement.'" *Reeves*, 599 P.2d at 735 (quoting *Erickson v. Alaska* (Alaska 1973), 507 P.2d 508, 514). The court then went on to point out that:

> There are two valid justifications for allowing a pre-incarceration inventory search exception to the warrant requirement. The first is the institutional interest in prohibiting the introduction of weapons, illegal drugs, and other contraband or potentially dangerous items into the jail environment. The second is the protection of the arrestee's property and the related interest of the jail administration in protecting itself against claims that loss or damage to that property occurred while the property was under the control of jail authorities.

*Reeves*, 599 P.2d at 735.

With regard to the first concern, the Alaska court held that it is addressed when the arrestee is required to surrender any items on his possession prior to incarceration, but that that interest is not furthered by searching those items after they are taken from the arrestee's possession. The Alaska court held that:

> Whatever the contents of the balloon, once the balloon was removed from Reeves' person the institutional interest in regulating the jail environment was protected and no further intrusion was necessary.

*Reeves*, 599 P.2d at 736.

With regard to the second valid concern, which was protection of the arrestee's property or protecting the State from invalid claims of damage to that property, the Alaska court noted that:

30

An arrestee's property can be sufficiently protected simply by placing it in a "property bag," as was apparently the practice at the jail involved here, or other segregated, secure place or container and storing it in a reasonable manner. If, as the state suggests, there is some question whether any items of the arrestee's property are particularly fragile or perishable, or otherwise unamenable to normal storage and handling, the arrestee could so inform the correctional officer conducting the search in response to an appropriate inquiry. However benevolent the state's intentions in this regard, the possibility that an item of the arrestee's property might require special care, handling, or storage cannot serve as a justification for a general search of the arrestee's possessions.

. . . .

. . . The state can effectively insulate itself against fraudulent claims by simply listing by description any items of property taken from an arrestee; securing those items in a property bag or other secure storage container used in the facility, preferably in the arrestee's presence; and obtaining the arrestee's signature acknowledging the correctness of the inventory so taken. If there is any question as to the contents of any container, the arrestee should be "consulted and offered the opportunity to request that an inventory be made of the contents" of such containers. We think the above procedure and limited search fairly and reasonably protects the state against fraudulent claims.

*Reeves*, 599 P.2d at 736-37 (footnotes omitted).

In conclusion, the Alaska court held that pursuant to its constitutional right to be free from unreasonable searches and seizures:

The search of an arrestee's person should be no more intensive than reasonably necessary to prevent the entry of weapons, illegal drugs, and other contraband or potentially dangerous items into the jail. Any items taken from the arrestee's possession in this search may not be further searched or opened except pursuant to a search warrant or another recognized exception to the warrant requirement applicable in the circumstances. Finally, the inventory conducted shall consist of a cataloging of the arrestee's property thus seized and may not, without a specific request from the arrestee, extend

31

> to a search and inventory of the contents of any object, closed or sealed container, luggage, briefcase, or package.

*Reeves*, 599 P.2d at 737-38.

I agree with these conclusions and observations set forth by the Supreme Court of Alaska in *Reeves v. State.* Interestingly, so did the rest of this Court at one time. *See State v. Sierra* (1985), 214 Mont. 472, 692 P.2d 1273 (where we declined to march lock-step with the same U.S. Supreme Court with which today we gladly march lock-step.) The only thing that has apparently justified a reversal of our previous constitutional analysis is a concern for hidden bombs based on what some of the members of the majority have observed on television.

If I understand the basis for the majority's conclusion that there was a compelling State interest to invade defendant's privacy by searching his backpack, it is that based on news reports of other violent incidents by other people elsewhere in the country, there is a reasonable possibility that this defendant, who was minding his own business when he was removed from the street for failing to pay city fines, and taken to the police station against his will and without any prior plan to go there, might have had a bomb in his backpack which, if stored, could explode and harm the police. What I do not understand is why the danger presented once defendant arrived at the police station was any greater than the danger presented before he arrived.

32

For example, under the majority's rationale, why wait until the police and defendant arrived at the police station. Couldn't the bomb have caused just as much damage if it blew up while in the police car?

Who should be allowed to open sealed packages that are inventoried in police stations? Should ordinary desk clerks be allowed to handle inventory searches, or should special training in the handling of explosives be required?

What about backpacks being worn at other locations by other people? In light of what we see on the news, are any of them safe? If not, should they be allowed?

In short, the possibilities for invading the privacy of Montana's citizens under the majority's rationale are endless. To make people in this country really safe we could suspend the entire bill of rights and then all they would have to worry about is being safe from the government. If we are going to do that, I wish the majority would rely on a little better authority than what it has seen on the evening news.

Since in this case we appear to have a smorgasbord of precedent from which to choose, I would conclude that the better reasoned opinions--those that are more consistent with my higher regard for the State Constitution than the U.S. Supreme Court apparently has for the Federal Constitution--are our decisions in *Sierra* and *Sawyer*. I would reverse *State v. LaMere* (1987), 226 Mont. 323, 735 P.2d 511, which is poorly reasoned, fails to distinguish prior

33

inconsistent cases, and does not give proper regard to the greater right of privacy found in the Montana Constitution.

For these reasons, while I conclude that the District Court's order is better reasoned than some of our prior cases, and while I believe it is a correct interpretation of this Court's prior decisions, I would reverse the order of the District Court which denies defendant's motion to suppress, and I dissent from the majority's decision to affirm it.

_____
Justice

Justice William E. Hunt, Sr., joins in the foregoing dissenting opinion.

_____
Justice

34

Justice Karla M. Gray, dissenting.

I respectfully dissent from the Court's opinion. While purporting to recognize the right of individual privacy guaranteed by the Montana Constitution and that Constitution's guaranteed right to be free from unreasonable searches, the Court significantly undermines those rights. Nor do I find support for the Court's action in our earlier cases. Moreover, it is my view that none of those cases is inconsistent. Indeed, when read, applied and distinguished appropriately, those cases compel a reversal of the District Court's denial of Pastos' motion to suppress evidence discovered during a routine inventory search of his rucksack at the jail following his arrest. I note first my general disagreement with the Court's approach and then briefly address our earlier cases.

First, I disagree that a compelling state interest was actually established here. In addition, it is my opinion that the Court fails to focus on the individual nature of the right to privacy under the Montana Constitution in addressing whether the compelling state interest it determines exists for intruding on this fundamental right is "closely tailored" to effect only that compelling state interest, as required by the United States Supreme Court's Zablocki decision. My point is best illustrated by the Court's anomalous conclusion that the individual right to privacy is not violated by a routine inventory search.

In this regard, the Court moves from the constitutionally

35

guaranteed individual right to privacy to a conclusion that the routine inventory search is the most practical means of dealing with the problem it has identified as a compelling state interest. In other words, the individual right to privacy gives way to a "practical and routine" approach which takes into account neither the nature of the item being searched nor the nature of the reason for the arrest. I cannot understand how such a "practical" approach comports with either Zablocki's "closely tailored" requirement or the fundamental rights guaranteed by the Montana Constitution.

More specifically, I disagree with the Court's extensive reliance on Illinois v. Lafayette, a case and approach soundly--and properly--rejected by us in Sierra in favor of the Alaska Supreme Court's "less-intrusive means" approach in Reeves. No suitable rationale is offered for this embrace of Lafayette, and no justification is offered for the Court's retreat from our firm and repeated stance in refusing to march in lock-step with the United States Supreme Court where the Montana Constitution calls for more protection of individual rights than does the U.S. Constitution. See, e.g., Sierra, 692 P.2d at 1276; Sawyer, 571 P.2d at 1133. Lafayette addressed only the Fourth Amendment to the U.S. Constitution and, therefore, it is not appropriate authority regarding the enhanced constitutional rights the people of Montana have provided for themselves in the Montana Constitution.

Finally, I disagree with the Court's view of the "apparent conflict" in our cases. An abbreviated synopsis of those cases

36

will suffice to support my conclusion that they compel a reversal of the District Court here.

Our cases addressing inventory searches of an arrestee's person and belongings maintain a consistent theme. All such cases differentiate between the search of an arrestee's person and a search of the contents of separate and closed items merely being carried by the arrestee--such as luggage, a briefcase or a package. In this regard, Sierra involved a closed suitcase being carried by the arrestee at the time of his arrest. We properly concluded that the inventory search of the suitcase constituted a prohibited intrusion into the arrestee's right to privacy under the Montana Constitution. The facts of that case are nearly identical to those presently before us.

The subsequent Lamping, LaMere and Holzapfel decisions are not inconsistent with Sierra. All maintain the differentiation between inventory searches of the arrestee and inventory searches of items not found on the person of the arrestee. Lamping involved the search and seizure of a pack of cigarettes taken from the arrestee's person. In upholding the search, we properly distinguished Sierra on the basis of the differentiation established therein.

Similarly, LaMere involved an inventory search of the arrestee's person. The State asked this Court to reconsider Sierra; we did not do so. Again, as in Lamping, we properly distinguished Sierra based on the differentiation we had established in that case.

37

Finally, in <u>Holzapfel</u>, we relied on <u>Lamping</u> for the distinction between searches of an arrestee's person and of other possessions not taken from the arrestee's person to uphold the use of an ultraviolet light to examine the wallet taken from the arrestee's person. We concluded that Holzapfel's right to privacy had not been violated.

I conclude that our cases are not inconsistent. Because the case presently before us involves a search not of items on the arrestee's person, but of a separate and closed possession of the kind before us in <u>Sierra</u>, I further conclude that the routine inventory search of Pastos' rucksack violated his individual right to privacy in that any compelling state interest was not met by the least intrusive means available and was not closely tailored to meeting any such interest.

I would reverse the District Court's denial of Pastos' motion to suppress evidence and vacate the judgment finding him guilty of the offense charged.

_____
Justice

Justice William E. Hunt, Sr., dissenting.

I dissent from the majority opinion for the reasons stated in my dissent in State v. LaMere (1987), 226 Mont. 323, 735 P.2d 511. This is another very long step down the road to making Article II, Sections 10 and 11, of the 1972 Montana Constitution worthless. I will not bother to repeat those reasons here, nor comment in any detail upon the statement of the majority that their opinion is limited to routine inventory searches conducted at station houses under standardized police administrative procedures applicable to all persons arrested. The constitutional protection was for the benefit of all citizens, and was intended as a mandate prohibiting intrusion on the privacy of individuals. This prohibition extends to us all, including law enforcement officials, not just some of the time, but all of the time, unless there is a compelling state interest. In my judgment, absolutely no compelling state interest has been shown here. If there was a compelling state interest to search the knapsack in this case, then all knapsacks are subject to search at any time for any reason.

_____
                Justice

39

December 20, 1994

## CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

Diana P. Leibinger, Esq.
Public Defender's Office
317 Woody St.
Missoula, MT 59802

Hon. Joseph P. Mazurek, Attorney General
Micheal Wellenstein, Assistant
Justice Bldg.
Helena, MT 59620

Robert L. Deschamps, III, County Attorney
Karen S. Townsend, Deputy
Missoula County Courthouse
Missoula, MT 59802

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
Deputy